# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2944

_____

United States of America

*Plaintiff - Appellee*

v.

Julius Lamon Jones

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: December 13, 2018
Filed: March 27, 2019

_____

Before SMITH, Chief Judge, WOLLMAN and GRASZ, Circuit Judges.

_____

SMITH, Chief Judge.

A jury convicted Julius Lamon Jones of interference with commerce by threat or violence ("Hobbs Act robbery"), in violation of 18 U.S.C. § 1951, and possession of a firearm in furtherance of a crime of violence (COV), in violation of 18 U.S.C.

§ 924(c). On appeal, Jones argues that the district court[1] erred in denying his motion for mistrial based on a government witness's response to his counsel's questioning. He also argues that the district court plainly erred in not granting a judgment of acquittal on the ground that his Hobbs Act robbery conviction is not a COV as defined in § 924(c). We affirm.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdict." *United States v. Daniel*, 887 F.3d 350, 353 (8th Cir. 2018) (quoting *United States v. Payne-Owens*, 845 F.3d 868, 870 n.2 (8th Cir. 2017)).

## A. *Underlying Facts*

Lee Sawyer managed Curt's Grocery, a small convenience store in Kennett, Missouri. Prior to July 1, 2015, Sawyer was familiar with three men who frequented his store: Jones; Jones's brother, Dontario Jones ("Dontario"); and Antonio Brown. Sawyer knew Jones and Dontario's family and had spoken to Jones and Dontario on numerous occasions in the store. During a two-year period, Sawyer spoke to Brown almost every day because of Brown's prior relationship with a store employee. Sawyer was familiar with all three men's voices.

On the night of July 1, 2015, just prior to closing, Sawyer went to lock the store's front door. He saw Brown approaching. Sawyer permitted Brown to enter the store because he knew Brown well. Once inside the store, Brown spoke to Sawyer and bought two items, including the last bottle of a certain beverage. Tracey Hon, a cashier, handled Brown's purchase. She also knew Brown because he frequented the store.

---

[1]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

-2-

Sawyer noticed that Brown had purchased the last bottle on the shelf and began walking to the storeroom to check inventory for restocking. Before reaching the storeroom, Sawyer heard the front door violently open, as if someone had kicked it in. Two men wearing facemasks and displaying handguns ran into the store. The first man ran to the cashier's area and threw Hon to the floor. The second man ran to an area next to a coin-operated carnival machine. Without speaking, both men opened fire on Sawyer. Four bullets struck Sawyer, causing him to fall to the floor. Sawyer shouted that he would tell them the money's location if they would quit shooting. They stopped.

The second man to enter the store approached Sawyer and demanded that Sawyer empty his pockets. Sawyer complied. Sawyer carried a 9 mm Kel-Tec pistol. The man took Sawyer's pistol. Sawyer then told Hon where the moneybags were located. Hon gave two moneybags to the first man, who had demanded the store's money. One of the moneybags was tan, and the other was green with "BancorpSouth" printed on it. Hon also opened the cash register drawers, and the first man took the cash. The cash registers and the two moneybags contained approximately $5,000. Sawyer kept a shotgun underneath the front counter. The first man grabbed it and headed for the door, but before leaving, he shot at Hon, barely missing her head. Both men left the store. William Bundy, a store employee, witnessed the robbery and called 911. Bundy reported seeing a gray car leave the store's parking lot after the robbery.

Sawyer told investigating officers that he recognized the two men's voices when they shouted during the robbery. Sawyer believed they had come to the store on other occasions. He identified the first man as Jones and the second man as his brother Dontario.

Kennett Police Officer Phillip Caldwell received a police dispatch alerting him to a robbery and shooting at Curt's Grocery. Officer Caldwell was informed that the car involved in the robbery was a gray or silver Toyota, traveling south. Officer

Caldwell identified the car and gave chase to the Arkansas border, where Arkansas law enforcement continued the chase.

After the car crossed the Arkansas state line, Mississippi County Deputy Sheriff Dale Stracener attempted to block the road with his patrol car, but the car evaded the obstruction and continued toward Blytheville, Arkansas. The car's occupants shot at Officer Stracener and other officers attempting to stop the vehicle. Officer Stracener returned gunfire. As it entered Blytheville, the car left the roadway and crashed in a muddy field. The three occupants fled on foot. Officer Stracener gave chase, finding the vehicle's driver under some bushes. The driver was identified as Brown.

Blytheville resident Steven Ellis ("Steven") witnessed the chase. He later saw a man in a neighborhood running down the street apparently talking on a cell phone. Steven did not recognize the man as a neighborhood resident. He watched as a yellow Cadillac Escalade picked up the man and drove away. Steven reported his observations to the police department, including the Cadillac Escalade's license plate number. He told the police that the Cadillac Escalade was traveling south toward Osceola, Arkansas.

Osceola Police Department Officer Chris Ellis heard police dispatch relay Steven's information, including the car's license plate number. Officer Ellis was familiar with the car and the license plate number. Officer Ellis and another officer intercepted the Cadillac Escalade as it entered Osceola. After stopping the vehicle, the officers identified the female driver as Reshawn Jones and the passenger as Jones, her husband. After Jones got out of the vehicle, Officer Ellis noticed that Jones's pants were covered with dirt and mud. Without prompting, Jones stated, "I haven't done anything. I'm just coming from Kennett gambling." Jury Tr. Proceedings, Vol. I, at 232, *United States v. Jones*, No. 1:16-cr-00035 (E.D. Mo. Mar. 13, 2017), ECF

-4-

No. 78. After detaining Jones, Officer Ellis drove to Jones's home in Osceola. Upon his arrival, he found Brown's Chevrolet Tahoe.

The officers who searched the Cadillac Escalade recovered a green BancorpSouth moneybag and a tan BancorpSouth moneybag. Sawyer later identified these moneybags as belonging to Curt's Grocery. The green moneybag contained $1,783 in cash, and the tan moneybag contained $350 in cash.[2]

Arkansas State Police Officer Scott Pillow searched the crashed Toyota Camry at the scene. He found several firearms in and around the vehicle, including the pistol stolen from Sawyer and the store's shotgun. Officer Pillow also found three ski masks in the car. One of those masks had DNA matching Jones's as a major contributor.

## B. *Procedural History*

Jones was charged with Hobbs Act robbery, aided and abetted by Brown and Dontario ("Count I"). He was also charged with possession of a firearm in furtherance of a COV, aided and abetted by Brown and Dontario ("Count II").

A few days prior to trial, the government sent Jones's attorney an e-mail, which provided in relevant part:

> By the way, Lee [Sawyer] and Tracey [Hon] both knew Brown very well. Sawyer knew both Jones brothers very well and will testify that he recognized their voices that night. He told Kennett police officer

---

[2]Jones moved to suppress "all items seized from [his] Cadillac Escalade, all testimony regarding [his] seizure and arrest from the Escalade, and any statements [he] allegedly made at the scene of his arrest." *United States v. Jones*, No. 1:16-cr-00035, 2016 WL 7477613, at *1 (E.D. Mo. Dec. 8, 2016) (alterations in original) (citation omitted), *R. & R. adopted*, No. 1:16-cr-00035, 2016 WL 7626594 (E.D. Mo. Dec. 28, 2016). Upon the magistrate judge's report and recommendation, the district court denied the motion to suppress. That ruling is not at issue in this appeal.

Waynick, as he was being loaded in the ambulance that, "Those were the same two . . . that robbed me the last time." Turns out that Lee [Sawyer] was robbed about a year earlier and that he recognized the voices then as the two Jones brothers. No arrests out of that case, even though it was reported. I don't intend to refer to the prior robbery and I've instructed Lee [Sawyer] not to answer any question with an answer about the prior robbery *unless you ask it*. I intend to call Officer Waynick and ask him a leading question, "Did Lee Sawyer tell you that he recognized the voices of the two men that robbed him?" That question, which Waynick will answer yes, will not disclose the prior robbery. *If you want to ask any followup, I'll leave that to you. Just wanted to make sure you knew how deep the water was*.

My entire case will be based on the following:

1) Sawyer's voice identification of both Jones brothers, including which one did what.
2) Hon's partial facial ID of Julius [Jones].
3) Julius [Jones's] DNA on the ski mask in the Camry.
4) The 911 caller, Stephen Ellis. (I'll send you the radio log with his report; we finally got all of that)[.]
5) Julius Jones'[s] muddy clothing when arrested.
6) The green money bag found in the Escalade will be identified by Lee Sawyer as coming from his store about an hour earlier.

Just don't want any surprises.

Keith

Appellee's Add. at A-1 (emphases added).

During trial, Sawyer testified for the government. Jones's counsel cross-examined Sawyer, apparently intending to show that Sawyer should not be believed when testifying that he recognized the voices of the Jones brothers. The following exchange occurred while Jones's attorney cross-examined Sawyer:

Q [by Jacob Zimmerman, Jones's counsel] I want to go back to you recognizing the voices of these individuals. How many times have one of your customers come in there and yelled loud at you, calling you a "motherf****r" or things like that?

A       Not very many.

Q       Not very many. Had Mr. Jones ever done that to you?

A       No, sir.

Q       Had his brother ever done that to you?

A       No, sir.

Q       But that's what these robbers were doing that night.

A       Yes, sir.

Q       Okay. So they weren't coming in using their normal voices. They were yelling.

A       Yes, sir.

Q       And you believe, based on them yelling, you're telling us that you still were able to identify their voices?

A       Yes, sir.

Jury Tr. Proceedings, Vol. I, at 131.

After questioning Sawyer about how he was able to recognize the assailants' voices, Jones's counsel then questioned Sawyer about his conversation with officers following the robbery. Sawyer confirmed that officers asked him questions about the

shooting to obtain information to apprehend the individuals and that Sawyer told the officers how the incident occurred. Thereafter, the following exchange occurred:

> Q    *But the first officers you spoke with, you didn't tell them that you recognized the voice of the two assailants, correct?*
>
> A    No, sir.
>
> Q    That would have been very important, though, right?
>
> A    Yes, sir.
>
> Q    I mean you just testified that you knew that it was important for them to try to apprehend these assailants, right?
>
> A    Yes, sir.
>
> Q    I mean guys that just had shot you, right? Correct?
>
> A    *I did—I did tell him that it was the same two people that robbed me the first time when I was on the parking lot, and I had done stated to the police that I believe they was the ones who robbed me the first time.*
>
> Q    But these individuals—*But you didn't tell them you recognized any voices, correct?*
>
> A    *I didn't say I recognized their voice. I just plainly told them it was the same two guys that robbed me the first time.*

*Id.* at 133–34 (emphases added).

Jones's counsel immediately requested a sidebar and moved the court for a mistrial based on Sawyer's answer, which identified Jones as someone who had previously robbed his store. The district court denied the motion, concluding, "I do

-8-

think that opened the door and he just responded. I'm going to deny your request for a mistrial." *Id.* at 135.

Both at the close of the government's case and at the close of all evidence, Jones moved for judgment of acquittal, which the district court denied. The jury found Jones guilty of both crimes. The probation office prepared a presentence investigation report (PSR), which calculated Jones's total offense level as 34 and his criminal history category as III, resulting in a Guidelines range of 188 to 235 months' imprisonment for Count I and 120 months' imprisonment for Count II. The district court sentenced Jones to a within-Guidelines sentence of 188 months' imprisonment on Count I and 120 months' imprisonment on Count II, to be served consecutively. The total sentence was 308 months' imprisonment.

## II. *Discussion*

On appeal, Jones argues that the district court erred in denying his motion for a mistrial and in denying his motions for judgment of acquittal.

## A. *Motion for Mistrial*

Jones argues that the district court erred in denying his motion for a mistrial during Sawyer's testimony. On cross-examination, Sawyer testified that Jones had robbed him on a prior occasion. Jones asserts that Sawyer's answer was non-responsive to his counsel's cross-examination questions that focused on whether Sawyer told the initial investigating officers that he recognized his assailants' voices. Jones argues that at no time did his counsel ever ask Sawyer about other facts that would him enable to identify the robbers aside from their voices. He insists his trial counsel never "opened the door" to permit testimony regarding the alleged prior robbery. Appellant's Br. at 11. He contends that the court erred by not giving a limiting instruction to limit the unfair prejudice caused by Sawyer's testimony.

"We review a district court's denial of a motion for a mistrial because of a witness's improper comment for abuse of discretion." *United States v. Sanchez-Garcia*, 685 F.3d 745, 752 (8th Cir. 2012). Because Sawyer never objected to the district court's lack of a curative instruction, "we review any decision by the district court to omit a curative instruction for plain error." *United States v. LeGrand*, 468 F.3d 1077, 1081 (8th Cir. 2006).

We have set forth several factors to consider in determining whether a witness's improper comment warrants a mistrial:

> (1) whether the remark was unsolicited; (2) whether the government's line of questioning was reasonable; (3) whether a limiting instruction was immediate, clear, and forceful; (4) whether any bad faith was evidenced by the government; and (5) whether the remark was only a small part of the evidence against the defendant.

*Sanchez-Garcia*, 685 F.3d at 752 (quoting *United States v. Branch*, 591 F.3d 602, 608 (8th Cir. 2009)).

In the typical case, a defendant moves for a mistrial based on allegedly improper testimony elicited by the government. *See, e.g.*, *id.* ("When asked by the prosecutor if he had any information about [the defendant's] involvement with [another] in the distribution of methamphetamine, [the government witness] responded . . . ."); *Branch*, 591 F.3d at 607 ("The outburst in question occurred during [the government witness's] testimony. The prosecution asked [the witness] about her transfer of $25,000 to a man that she knew as Josh Edwards . . . ."). By contrast, Jones moved for a mistrial based on testimony elicited by his own counsel.

Applying the aforementioned factors to this unique case, we hold that the district court did not abuse its discretion in denying Jones's motion for a mistrial or plainly err in omitting a curative instruction. First, the government did not solicit the

remark from Sawyer. Instead, Sawyer spoke in response to a series of questions by defense counsel. Viewed in their totality, these questions, outlined above, demonstrate that defense counsel's line of questioning concerned whether Sawyer, on July 1, 2015, told law enforcement anything about the robbers' identities, including recognition of their voices. This line of questioning was not limited to Sawyer's ability to recognize Jones's voice. To be sure, Sawyer could have simply answered the final question, "No." Instead, Sawyer used the answer to clarify what he actually had told the officers. He said, "I didn't say I recognized their voice. I just plainly told them it was the same two guys that robbed me the first time." Jury Tr. Proceedings, Vol. I, at 134. Jones's counsel requested and received a sidebar seeking a mistrial but did not request a curative instruction. Sawyer's answer was not so unresponsive as to have warranted a mistrial.

The second factor concerns the reasonableness of the government's line of questioning. Here, however, defense counsel asked the questions that produced the allegedly improper comment. During its direct examination, the government asked about Sawyer's prior dealings with the Jones brothers, and Sawyer testified that he had spoken with Jones "dozens" of times, *id.* at 123, and Dontario "hundreds of times." *Id.* at 124. Sawyer testified in response to leading questions that he recognized both of the robbers' voices and that he told "the officers that night that [he] recognized the voices of the two men." *Id.* at 126. The government's unobjected-to line of questioning avoided eliciting a response from Sawyer concerning the prior robbery. These questions were reasonable.

The third factor concerns whether the district court gave an "immediate, clear, and forceful" curative instruction following an improper comment. *Sanchez-Garcia*, 685 F.3d at 752. But Jones never requested a curative instruction following Sawyer's testimony. On these facts, not issuing the instruction sua sponte was not error, plain or otherwise. The district court correctly found that Sawyer's answers were

responsive to Jones's counsel's line of questioning and that Jones's counsel "opened the door" to the prior robbery statement by Sawyer.

Fourth, there was no bad faith on the government's part resulting in Sawyer's testimony about the prior robbery. The government alerted Jones in advance of its use of Sawyer's testimony and kept its direct examination in line with its stated use and avoided any mention of the prior robbery. The government suggested that Jones's counsel might want to limit his questions when inquiring about how Sawyer reported the identity of the robbers to the investigating officers. The government's conduct here is far removed from bad faith. *See, e.g.*, *United States v. Rounsavall*, 115 F.3d 561, 565 (8th Cir. 1997) (holding that witness's reference to defendant's prior incarceration did not justify a mistrial, where witness made improper statement after six days of trial testimony that included "overwhelming" evidence of defendant's guilt, statement occurred during cross-examination by defense counsel, prosecution never discussed remark, witness had no motive to hurt defendant, jury received immediate and appropriate instructions to disregard improper statement, and court offered to give similar jury instructions at close of prosecution's evidence and at end of trial, but defense counsel declined).

Finally, Sawyer's "remark was only a small part of the evidence against the defendant." *Sanchez-Garcia*, 685 F.3d at 752 (quoting *Branch*, 591 F.3d at 608). The evidence against Jones is overwhelming. Sawyer identified Jones's voice as belonging to one of the two men who shot him and the man who accosted his cashier and took the money from her. Jones's DNA was on a ski mask left in the getaway car after it crashed in Blytheville. Jones was arrested a short time after the Blytheville crash in the second getaway car in Osceola, Arkansas, and two money bags taken from Curt's Grocery were found in the second getaway car less than an hour later.

-12-

B. *Motion for Judgment of Acquittal*

Jones also argues that the district court erred in denying his motions for judgment of acquittal on the ground that his Hobbs Act robbery falls under 18 U.S.C. § 924(c)(3)(B) instead of § 924(c)(3)(A). Jones contends that § 924(c)(3)(B) is unconstitutionally vague, and as a result, his conviction cannot constitute a COV. But Jones admits that he did not make this argument to the district court in moving for judgment of acquittal. He thus concedes that our review is for plain error. *See United States v. Samuels*, 874 F.3d 1032, 1036 (8th Cir. 2017) ("'When a defendant raises specific grounds in a Rule 29 motion, grounds that are not specifically raised are waived on appeal.' At most, we review such forfeited issues for plain error." (first quoting *United States v. Chong Lam*, 677 F.3d 190, 200 (4th Cir. 2012), then citing *United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013))). "Plain error means an error that is clear under current law, caused prejudice, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Borders*, 829 F.3d 558, 564 (8th Cir. 2016).

Section 924(c) prohibits a person from using or carrying a firearm during and in relation to a COV or possessing a firearm in furtherance of a COV. The statute defines COV as a felony offense that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

Jones's "indictment charged him with committing Hobbs Act robbery, 18 U.S.C. § 1951(a), as the [COV]." *Diaz v. United States*, 863 F.3d 781, 783 (8th Cir.

-13-

2017); *see also* Indictment at 1, *United States v. Jones*, No. 1:16-cr-00035 (E.D. Mo. Mar. 17, 2016), ECF No. 1. Jones "contends that Hobbs Act robbery, *see* 18 U.S.C. § 1951(a)(1), (b)(1), does not qualify as a COV predicate as defined in § 924(c)(1)(A)." *United States v. Bowens*, 907 F.3d 347, 353 (5th Cir. 2018), *cert. denied*, No. 18-7612, 2019 WL 358681 (U.S. Mar. 4, 2019). According to Jones, a defendant could violate the Hobbs Act by "conspiracy" or by creating a "fear of injury"; as a result, a violation of the Act could "be done without the use of force or threat of force" as provided in § 924(c)(3)(A). Appellant's Br. at 15–16.

"The Hobbs Act defines robbery to include 'the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury . . . to his person or property.'" *Diaz*, 863 F.3d at 783 (ellipsis in original) (quoting 18 U.S.C. § 1951(b)). "Like other circuits, we have expressly held that Hobbs Act robbery has as an element the use, attempted use, or threatened use of physical force against the person of another, the operative term in *§ 924(c)(3)(A)*." *Id*. (emphasis added) (cleaned up).

In *Sessions v. Dimaya*, the Supreme Court held that language identical to that found in *§ 924(c)(3)(B)* was unconstitutionally vague. 138 S. Ct. 1204, 1223 (2018). But our sister circuits have held that *Dimaya* has no impact on circuit precedent holding that Hobbs Act robbery is a COV predicate under *§ 924(c)(3)(A)*.[3] We agree

---

[3] *See, e.g.*, *United States v. Allen*, 750 F. App'x 490, 492 (7th Cir. 2019) (recognizing that "a Hobbs Act robbery is a 'crime of violence' under the elements clause found in § 924(c)(3)(A)" and that "[a]t most *Dimaya* bears on the constitutionality of the residual clause, 18 U.S.C. § 924(c)(3)(B)"); *Bowens*, 907 F.3d at 353 ("As the government correctly notes, binding circuit precedent forecloses Bowens's claim that Hobbs Act robbery is not a COV predicate under 18 U.S.C. § 924(c)(3)(A)."); *United States v. Barrett*, 903 F.3d 166, 169 (2d Cir. 2018) ("We here conclude that Barrett's challenge to his . . . convictions—predicated on *substantive* Hobbs Act robberies—is defeated by *United States v. Hill*, 890 F.3d 51

-14-

and accordingly hold that the district court did not plainly err in denying Jones's motions for judgment of acquittal on Count II.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

(2d Cir. 2018), which, post-*Dimaya*, holds substantive Hobbs Act robbery to be a categorical crime of violence within the definition of § 924(c)(3)(A).").